UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. <u>24-cr-131-JB</u> |
| v. | VIOLATIONS: |
| AUSTAL USA, LLC | 15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. § 240.10b-5 |
| | 18 U.S.C. § 1516 |

**PLEA AGREEMENT**

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Alabama (the "Office") (collectively, the "Offices"), and the Defendant, Austal USA, LLC (the "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Managers, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Austal Limited ("Parent"), the Defendant's parent company, which is not a defendant in this matter, also agrees, pursuant to the authority granted by Parent's Board of Directors, to certain terms and obligations of the Agreement as described below. The terms and conditions of this Agreement are as follows:

**Term of the Defendant's and Parent's Obligations Under the Agreement**

1.      Except as otherwise provided in Paragraph 11 below in connection with the Defendant's and Parent's cooperation obligations and in Paragraph 27 below in connection with the term of the Monitor, the Defendant's and Parent's respective obligations under the Agreement shall last and be effective for a period beginning on the date on which the Information is filed and

1

ending three years from the later of the date on which the Information is filed or the date on which the Monitor is retained by the Defendant as described in Paragraphs 26-28 below (the "Term"). The Defendant and Parent agree, however, that in the event the Offices determine, in their sole discretion, that the Defendant or Parent has knowingly violated any provision of this Agreement or failed to completely perform or fulfill any of their obligations under this Agreement, the Offices, in their sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 29-32 below. Any extension of the Term extends all terms of this Agreement, including the terms of the monitorship described in Attachment D, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Term may be terminated early, except for the Defendant's and Parent's cooperation obligations described in Paragraph 11 below.

## The Defendant's and Parent's Agreement

2.       Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the District Court for the Southern District of Alabama, and to plead guilty to a two-count criminal Information charging the Defendant with one count of Securities Fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and one count of Obstruction of a Federal Audit, in violation of Title 18, United States Code, Section 1516.  The Defendant further agrees to persist in that plea through sentencing and, as set forth below, the Defendant and Parent agree to cooperate fully with the Offices in their investigation into the conduct described in this Agreement and any other investigation by the Fraud Section, the Office, or any other Department of Justice component.

2

3.      The Defendant understands that, to be guilty of these offenses, the following essential elements of the offense must be satisfied:

Count One—Securities Fraud

 a. First, that in connection with the purchase or sale of securities, the Defendant did any one or more of the following:

  i. employed a device, scheme, or artifice to defraud;

  ii. made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or

  iii. engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

 b. Second, the Defendant's acts were undertaken, its statements were made, or its failure to disclose was done in connection with the sale of securities;

 c. Third, the Defendant directly or indirectly used its public securities filings in connection with these acts, or making these statements, or its failure to disclose; and

 d. Fourth, the Defendant acted knowingly and willfully, and used the means and instrumentalities of interstate commerce, the mails, or the facilities of national securities exchanges, in connection with the dissemination of false information for the purpose of defrauding buyers of securities.

Count Two—Obstruction of a Federal Audit

 a. First, the Defendant endeavored to influence, obstruct, or impede a Federal auditor in the performance of official duties;

3

    b.   Second, the official duties related to a person, entity, or program receiving in excess of $100,000, directly or indirectly from the United States in any 1 year period under a contract or subcontract, grant, or cooperative agreement; and

    c.   Third, the Defendant acted with the intent to deceive or defraud the United States.

4.    The Defendant understands and agrees that this Agreement is among the Offices, the Defendant, and Parent and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant and Parent, their direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant or Parent.

5.    The Defendant and Parent agree that this Agreement will be executed by authorized corporate representatives.  The Defendant and Parent further agree that resolutions duly adopted by the Defendant's Board of Managers and Parent's Board of Directors, respectively, in the form attached to this Agreement as Attachment B, authorize the Defendant and Parent to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant's and Parent's corporate representatives and their counsel are authorized by the Defendant's Board of Managers and Parent's Board of Directors, on behalf of the Defendant and Parent, respectively.

6.    The Defendant and Parent agree that each has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

7.     The Offices enter into this Agreement based on the individual facts and circumstances presented by this case, including:

   a.  The nature and seriousness of the Defendant's offense conduct, as described in the Statement of Facts, including an over-two-year-long scheme to falsify the Defendant's accounting records and fraudulently inflate the value of Parent's publicly traded securities, thereby causing pecuniary harm to the investing public by inflating the value of Parent's publicly traded securities by over $48 million; and providing false financial information to the United States Department of Defense in order to obstruct an audit requested by the United States Navy of the Defendant's financial capability to perform on its government contracts;

   b.  The pervasiveness of the offense, which involved multiple of the Defendant's employees and members of its former senior executive management, including its president and its chief financial officer, who personally conducted and promoted the scheme;

   c.  The Defendant did not receive voluntary disclosure credit pursuant to the Criminal Division Corporate Enforcement and Voluntary Self-Disclosure Policy ("Criminal Division CEP"), or pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), because it did not voluntarily and timely disclose to the Offices the conduct described in the Statement of Facts;

   d.  The Defendant received credit pursuant to U.S.S.G. § 8C2.5(g)(3) because it demonstrated recognition and affirmative acceptance of responsibility for its

criminal conduct; the Defendant also received cooperation credit pursuant to the Criminal Division CEP because it facilitated interviews with current and former employees, made a timely disclosure of all relevant facts and documents pertaining to a matter not covered by the Statement of Facts, and enabled the Offices to promptly produce records pursuant to the Offices' disclosure process in a related court case.  However, the Defendant's cooperation was limited in a number of respects, including: the Defendant did not provide to the Offices any relevant facts relating to the conduct described in the Statement of Facts until two years after learning of the Offices' investigation; the Defendant produced certain relevant documents after significant delay; the Defendant was delayed in responding to certain requests from the government, and often required follow-up requests from the government before responding; and did not at all times demonstrate a commitment to full and timely cooperation.  Therefore, the Offices determined that a discount of 5 percent off the bottom of the applicable U.S. Sentencing Guidelines fine range was appropriate pursuant to the Criminal Division CEP;

e.   The Defendant engaged in remedial measures, but those remedial measures were untimely and incomplete, including that the Defendant did not begin disciplining employees involved in the conduct described in the Statement of Facts until more than two years after the Defendant learned of the government's investigation; and did not undertake any independent steps to make restitution to the victims of its securities fraud scheme;

f.   The Defendant had an inadequate and ineffective compliance program and internal controls over financial reporting during the period of the conduct described in the Statement of Facts; the Defendant has begun remediating weaknesses in internal controls that allowed the Defendant's misconduct to occur, but the Defendant's remediation of its controls is still ongoing and requires additional improvements and testing; the Defendant has begun to enhance the compliance program by, among other things, establishing a Compliance Committee and an Audit Committee of the Board of Managers, hiring a new chief compliance officer, retaining the services of a third-party compliance consultant, and conducting a compliance risk assessment;

g.   The Defendant has committed to building a compliance program that satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

h.   Based on the state of the Defendant's compliance program and the progress of its remediation, including the fact that the Defendant's compliance program and internal controls have not been fully implemented or tested to demonstrate that they would prevent and detect similar misconduct in the future, the Offices have determined that an independent compliance monitor (the "Monitor") is necessary as set forth in Paragraphs 24-28 and Attachment D to this Agreement (Independent Compliance Monitor);

i.   The Defendant does not have a prior history of criminal or civil regulatory actions;

7

j.  The Defendant has agreed to resolve concurrently an investigation by the U.S. Securities and Exchange Commission ("SEC") relating to conduct described in the Statement of Facts through a settled United States District Court action, and agreeing to pay restitution in an amount to be determined through a victim claims process handled by the SEC as set forth in Paragraph 21(e);

k.  The Defendant has agreed to continue to cooperate with the Offices and the SEC in any ongoing investigation or prosecution as described in Paragraph 11 below;

l.  The Defendant met its burden of establishing an inability to pay the criminal penalty sought by the Offices, despite agreeing that the proposed amount was otherwise appropriate based on the law and the facts.  The Offices, with the assistance of a forensic accounting expert, conducted an independent ability to pay analysis, considering a range of factors outlined in the Justice Department's Inability to Pay Guidance (*see* October 8, 2019 Memorandum from Assistant Attorney General Brian Benczkowski to All Criminal Division Personnel re: Evaluating a Business Organization's Inability to Pay a Criminal Fine or Criminal Monetary Penalty), including but not limited to: (i) the factors outlined in 18 U.S.C. § 3572 and the United States Sentencing Guidelines § 8C3.3(b); (ii) the Defendant and Parent's current financial condition; (iii) the Defendant and Parent's alternative sources of capital; and (iv) the collateral consequences of the imposition of the full fine amount.  Based on that independent analysis, the Offices determined that paying a criminal penalty greater than $24,000,000 would substantially threaten the continued viability of the Defendant.

8

m.  Accordingly, after considering (a) through (l) above, the Offices believe that a guilty plea to the Information, a criminal penalty of $24,000,000, and restitution to victims of the securities fraud scheme in an amount to be determined through a victim claim process handled by the SEC are sufficient but not greater than necessary to achieve the purposes described in 18 U.S.C. § 3553.

8.  The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

a.  to plead guilty as set forth in this Agreement;

b.  to abide by all sentencing stipulations contained in this Agreement;

c.  to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

d.  to commit no further crimes;

e.  to be truthful at all times with the Court;

f.  to pay the applicable fine and special assessment;

g.  to cooperate fully with the Offices as described in Paragraph 11;

h.  to continue to implement a compliance and ethics program as described in Paragraph 9 and Attachment C of this Agreement; and

i.  to retain an independent compliance monitor in accordance with Attachment D of this Agreement.

9.  The Defendant and Parent represent that they will implement a compliance and ethics program at the Defendant designed to prevent and detect potential violations of U.S. federal

9

anti-fraud or government audit obstruction laws throughout the Defendant's operations, including those of its affiliates, agents, and joint ventures, including, but not limited to, the minimum elements set forth in Attachment C. Thirty days prior to the expiration of the Term, the Defendant, by its President and Chief Compliance Officer, and Parent, by its Chief Executive Officer and General Counsel, will certify to the Offices, in the form of executing the document attached as Attachment F to this Agreement, that the Defendant and Parent have met their compliance obligations pursuant to this Agreement. This certification will be deemed a material statement and representation to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

10. Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant and Parent agree that in the event that, during the Term, the Defendant or Parent undertake any change in corporate form, including if they sell, merge, or transfer business operations that are material to Parent's or the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in Attachment A of the Agreement attached hereto, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity. The Defendant and Parent agree that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant and Parent shall provide notice to the Offices at least thirty (30)

10

days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Defendant and Parent prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. In addition, if at any time during the Term the Defendant or Parent engage in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 29-32. Nothing herein shall restrict the Defendant and Parent from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

11.     The Defendant and Parent shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Attachment A and other conduct under investigation by the Fraud Section, the Office, or any other component of the Department of Justice at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded or the end of the Term. At the request of the Offices, the Defendant and Parent shall also cooperate fully with other domestic law enforcement and regulatory authorities and agencies in any investigation of the Defendant, Parent, or their affiliates, or any of its present or former officers, managers, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and Attachment A and other conduct known by the Defendant and Parent to be under investigation by the Fraud Section, the Office, or any other component of the Department of Justice. The Defendant's and Parent's cooperation pursuant to this Paragraph is subject to

11

applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant and Parent must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant and Parent bear the burden of establishing the validity of any such assertion.  The Defendant and Parent agree that their cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

      a.     The Defendant and Parent represent that they have timely and truthfully disclosed all factual information with respect to the Defendant's activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants relating to the conduct described in the Information and Statement of Facts, as well as any other conduct under investigation by the Offices at any time about which the Defendant or Parent has any knowledge.  The Defendant and Parent further represent that they shall promptly and truthfully disclose all factual information with respect to their activities, those of their affiliates, and those of their present and former directors, officers, employees, agents, and consultants related to the conduct described in this Agreement or the Statement of Facts, about which the Defendant and/or Parent has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant and Parent to provide to the Offices, upon request, any document, record, or other tangible evidence about which the Offices may inquire of the Defendant and Parent, including evidence that is responsive to any requests made prior to the execution of this Agreement.

      b.     Upon request of the Offices, the Defendant and Parent shall designate knowledgeable employees, agents, or attorneys to provide to the Offices the information and materials described in Paragraph 11(a) above on behalf of the Defendant and Parent.  It is further

understood that the Defendant and Parent must at all times provide complete, truthful, and accurate information.

  c. The Defendant and Parent shall use best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents, and consultants of the Defendant and Parent. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant and Parent, may have material information regarding the matters under investigation.

  d. With respect to any information, testimony, documents, records, or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant and Parent consent to any and all disclosures to other governmental authorities including United States authorities and those of a foreign government of such materials as the Offices, in their sole discretion, shall deem appropriate.

  12. In addition to the obligations provided for in Paragraph 11 of the Agreement, during the Term, should the Defendant or Parent learn of any evidence or allegation of conduct that may constitute a violation of federal anti-fraud laws relating to the Defendant, fraud or misrepresentations related to the Defendant's or Parent's contracts with the United States government, false or misleading statements made in the Defendant's or Parent's financial reporting or accounting, or fraud, deception, or obstruction in external audits of the Defendant or Parent, the Defendant and Parent shall promptly report such evidence or allegation to the Offices. On the date the Term expires, the Defendant and Parent, by the President and the Chief Financial Officer of the Defendant, and the Chief Executive Officer and Chief Financial Officer of Parent will certify

to the Offices, in the form of executing the document attached as Attachment E to this Agreement, that the Defendant and Parent have met their disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant and Parent to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

13.    The Defendant agrees that any fine or restitution imposed by the Court will be due and payable as specified in Paragraph 21 below, and that any restitution imposed by the Court will be due and payable in accordance with the Court's order.  The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of Alabama the mandatory special assessment of $400 per count within ten business days from the date of sentencing.

### The United States' Agreement

14.    In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, parent companies, subsidiaries, or joint ventures relating to (a) any of the conduct described in the Information or Attachment A, or (b) information made known by the Defendant or its direct or indirect affiliates, parent companies, subsidiaries, or joint ventures to the Offices prior to the date of this Agreement. The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Defendant or Parent in any prosecution or other proceeding relating to (a) obstruction of justice; (b) perjury or making a false statement; (c) any crime of violence or terrorism-related offense; or (d) a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by the

14

Defendant or Parent, or any of their direct or indirect subsidiaries and affiliates.  In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant.  The Defendant and Parent agree that nothing in this Agreement is intended to release the Defendant or Parent from any and all of their tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

### Factual Basis

15.     The Defendant is pleading guilty because it is guilty of the charges contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment A are true and correct, that the Defendant is responsible for the acts of the Defendant's officers, managers, employees, and agents described in the Information and Attachment A, and that the Information and Attachment A accurately reflect the Defendant's criminal conduct. The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

### The Defendant's Waiver of Rights, Including the Defendant's Right to Appeal

16.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the

Statement of Facts set forth in this Agreement, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving any of the Offices and the Defendant, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, the Defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United States Sentencing Guidelines (including U.S.S.G. § 1B1.1(a)) that the Statement of Facts set forth in Attachment A to this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form).  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has accepted the guilty plea, the Defendant nevertheless withdraws its guilty plea.

17.    The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement.  The Defendant understands that the rights of criminal defendants include the following:

(a)    the right to plead not guilty and to persist in that plea;

(b)    the right to a jury trial;

(c)    the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

(d)      the right at trial to confront and cross-examine adverse witnesses, to testify and present evidence, and to compel the attendance of witnesses; and

(e)      pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement. This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge to either the conviction or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant and Parent waive all defenses based on the statute of limitations and venue with respect to any criminal prosecution by the Offices related to the conduct described in Attachment A or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant or Parent violate this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of Agreement, or withdrawal of plea plus the remaining time period of the

statute of limitations as of the date that this Agreement is signed.  The Defendant further waives the right to raise on appeal or on collateral review any argument that the statutes to which the Defendant is pleading guilty is unconstitutional and/or the admitted conduct does not fall within the scope of the statutes.  The Offices are free to take any position on appeal or any other post-judgment matter.  The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver.  Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant or Parent from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Penalty

18.     The statutory maximum sentence that the Court can impose for a violation of Title 15, United States Code, Section 78j(b), is a fine of $25,000,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 15, United States Code, Section 78ff(a) and Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400 per count, Title 18, United States Code, Section 3013(a)(2)(B).  The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1516, is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c) and (d), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400 per count, Title 18, United States Code, Section 3013(a)(2)(B).  In this case, the parties agree that the gross pecuniary loss resulting from the offenses is $48,403,079.  Therefore, pursuant to 18 U.S.C. § 3571(d), the maximum fine that may be imposed is $96,806,158.

**Sentencing Recommendation**

19.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 21.

20.     The Offices and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

a.      The November 1, 2023 U.S.S.G. are applicable to this matter.

b.      <u>Offense Level</u>.  Based upon U.S.S.G. § 2B1.1, the total offense level is 33, calculated as follows:

| | | |
|---|---|---|
| (a)(1) | Base Offense Level | 7 |
| (b)(1) | Amount of Loss/Gain | +22 |
| (b)(2)(A) | 10 or more victims | +2 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 33 |

c.      <u>Base Fine</u>.  Based upon U.S.S.G. § 8C2.4(a)(2), the base fine is $48,403,079 (the pecuniary harm resulting from the offense)

<u>Culpability Score</u>.  Based upon U.S.S.G. § 8C2.5, the culpability score is 8, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(2) | the organization had 1,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +4 |
| (g)(3) | The organization clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 1 |
| | **TOTAL** | 8 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $48,403,079 |
| Multipliers | 1.60(min)/3.20 (max) |
| Fine Range | $77,444,926.40 (min)/ $154,889,852.80 (max) |

21.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Offices and the Defendant agree that the following represents the appropriate disposition of the case:

a.     Disposition.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court at a hearing to be scheduled at an agreed upon time impose a sentence requiring the Defendant to pay a criminal fine.  Specifically, the parties agree, based on the application of the United States Sentencing Guidelines, that the appropriate criminal penalty is $73,572,680.10 (the "Total Criminal Fine"), subject to a reduction based on the Defendant's and Parent's ability to pay that amount as detailed below.  This reflects a 5 percent discount off the bottom of the Sentencing Guidelines fine

range, taking into consideration the Defendant's cooperation and remediation, as well as its prior history, pursuant to the Corporate Enforcement and Voluntary Self-Disclosure Policy.

      b.     The Defendant has represented, and the Offices have independently verified, that the Defendant has an inability to pay a criminal fine of $73,572,680.10 or to pay restitution of $48,403,079.  Accordingly, the Defendant agrees to pay a fine of $24,000,000 no later than twelve months plus ten days after the entry of judgment of the Defendant's sentence by the Court.

      c.     The Offices agree that up to one-hundred percent of the fine will be offset by any payment made by the Defendant or Parent pursuant to a settlement among the Defendant, Parent, and the SEC relating to the conduct described in Attachment A.  In the event that such payments by the Defendant or Parent amount to less than $24,000,000 in the twelve months following the entry of judgment of the Defendant's sentence by the Court, the Defendant will be required to pay the full remaining fine amount to the United States Treasury within ten (10) business days of the expiration of such twelve-month period.  The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source other than Parent with regard to the penalty amount that Defendant pays pursuant to the Agreement or any other agreement entered into with a domestic enforcement authority or regulator concerning the facts set forth in Attachment A.  The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of this $24,000,000 fine.

d.    <u>Mandatory Special Assessment</u>.  The Defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of Alabama within ten days of the time of sentencing the mandatory special assessment of $400 per count.

e.    <u>Restitution</u>.  Taking into account the Defendant's and Parent's inability to pay restitution as detailed in Paragraph 7(l), Defendant agrees to be obligated to pay restitution to victims of the conduct described in Attachment A in the amount of $24,000,000 or less prior to the termination of this Agreement, the specific amount to be determined by an SEC claims administration process involving the calculation of realized losses incurred by specific victims.  The Offices agree to credit any payments made by the SEC to victims of the conduct described in Attachment A toward reducing the Defendant's obligations to pay restitution under this Agreement and that up to one-hundred percent of Defendant's obligations to pay restitution will be offset by any payment made by the Defendant or Parent pursuant to a settlement among the Defendant, Parent, and the SEC relating to the conduct described in Attachment A.  In the event that the Defendant does not pay $24,000,000 to the SEC within twelve months following the entry of judgment of the Defendant's sentence by the Court, restitution will be determined by a third-party claims administrator (retained at the expense of the Defendant) by calculating the realized losses incurred by specific victims.

f.    <u>Probation</u>.   The Offices and the Defendant agree that a term of organizational probation for a period of three years shall be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1).  The parties agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions

22

the obligations set forth in Paragraph 8(a-g) above as well as the payments of the fine and restitution amounts set forth in Paragraphs 21(c) and (e).

22.     This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant and Parent understand that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated.  The Defendant and Parent further understand that if the Court refuses to accept any provision of this Agreement, no party shall be bound by the provisions of the Agreement.

23.     The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek a sentencing by the Court immediately following the Rule 11 hearing in the absence of a PSR.  The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court.  In the event the Court directs the preparation of a PSR, the Offices will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

## **Independent Compliance Monitor**

24.     Promptly after the Offices' selection pursuant to Paragraph 26 below, the Defendant agrees to retain a Monitor for the term specified in Paragraph 27.  The Monitor's duties and authority, and the obligations of the Defendant and Parent with respect to the Monitor and the Offices, are set forth in Attachment D, which is incorporated by reference into this Agreement. Within 30 business days after the date of execution of this Agreement, the Defendant shall submit

a written proposal to the Offices identifying three monitor candidates, and, at a minimum, providing the following:

      a.     a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

      b.     a written certification by the Defendant that it will not employ or be affiliated with the Monitor for a period of not less than three years from the date of the termination of the monitorship;

      c.     a written certification by each of the candidates that he/she is not a current or recent (i.e., within the prior two years) employee, agent, or representative of the Defendant and holds no interest in, and has no relationship with, the Defendant, its subsidiaries, affiliates, or related entities, or its employees, officers, or directors;

      d.     a written certification by each of the candidates that he/she has notified any clients that the candidate represents in a matter involving the Offices (or any other Department component) handling the monitor selection process, and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

      e.     a statement identifying the monitor candidate that is the Defendant's first, second, and third choice to serve as the Monitor.

      25.     The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

      a.     demonstrated expertise with respect to U.S. federal anti-fraud laws, including fraud laws related to public company reporting and government contracting;

      b.     experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including with respect to U.S. federal anti-fraud laws;

c.        the ability to access and deploy resources as necessary to discharge the
Monitor's duties as described in the Agreement; and

d.        sufficient independence from the Defendant and Parent to ensure effective
and impartial performance of the Monitor's duties as described in the Agreement.

26.    The Offices retain the right, in their sole discretion, to choose the Monitor from
among the candidates proposed by the Defendant, though the Defendant may express its
preference(s) among the candidates.  Monitor selections shall be made in keeping with the
Department's commitment to diversity and inclusion.  If the Offices determine, in their sole
discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the
Offices, in their sole discretion, are not satisfied with the candidates proposed, the Offices reserve
the right to request that the Defendant nominate additional candidates.  In the event the Offices
reject any proposed Monitors, the Defendant shall propose additional candidates within twenty
business days after receiving notice of the rejection so that three qualified candidates are proposed.
This process shall continue until a Monitor acceptable to both parties is chosen.  The Offices and
the Defendant will use their best efforts to complete the selection process within sixty calendar
days of the execution of this Agreement.  If the Monitor resigns or is otherwise unable to fulfill
his or her obligations as set out herein and in Attachment D, the Defendant shall within twenty
business days recommend a pool of three qualified Monitor candidates from which the Offices
will choose a replacement.

27.    The Monitor's term shall be three years from the date on which the Monitor is
retained by the Defendant, subject to extension or early termination as described in Paragraph 1.

28.    The Monitor's powers, duties, and responsibilities, as well as additional
circumstances that may support an extension of the Monitor's term, are set forth in Attachment

25

D.  The Defendant and Parent agree that they will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than three years from the date on which the Monitor's term expires.  Nor will the Defendant or Parent discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.  Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with related resolutions with foreign or other domestic authorities.

### Breach of Agreement

29.     If, during the Term, (a) the Defendant commits any felony under U.S. federal law; (b) the Defendant or Parent provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) the Defendant or Parent fails to cooperate or disclose information as set forth in Paragraphs 11 and 12 of this Agreement; (d) the Defendant or Parent fails to implement a compliance program at the Defendant and complete a monitorship as set forth in Paragraphs 9 and 24-28 of this Agreement and Attachments C and D; (e) the Defendant commits any acts that, had they occurred within the jurisdictional reach of federal anti-fraud laws, would be a violation of federal anti-fraud laws; or (f) the Defendant or Parent otherwise fails specifically to perform or to fulfill completely each of the Defendant's and Parent's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the term specified in Paragraph 1 of the Agreement, the Defendant, Parent, and their subsidiaries and affiliates shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, additional charges arising out of the conduct described in the Statement of Facts attached hereto as Attachment A, distinct from the charges in the Information described in Paragraphs 2 and 3, as well as charges related to any additional

criminal conduct, if appropriate,  which may be pursued by the Offices in the U.S. District Court for the Southern District of Alabama or any other appropriate venue.  Additionally, a breach of Paragraphs 10, 11, or 20 of this Agreement may constitute a violation of the Defendant's probation. Determination of whether the Defendant or Parent has breached the Agreement and whether to pursue prosecution of the Defendant or Parent shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Defendant, Parent, their subsidiaries or affiliates, or the personnel of any of the foregoing.  Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, Parent, and their subsidiaries and affiliates notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Defendant and Parent agree that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  The Defendant and Parent give up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.  In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation and disclosure obligations provided for in Paragraphs 11 and 12 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the term plus five years, and that this period shall

27

be excluded from any calculation of time for purposes of the application of the statute of limitations.

30.     In the event the Offices determine that the Defendant or Parent has breached this Agreement, the Offices agree to provide the Defendant and Parent with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, the Defendant and Parent shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant and Parent have taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant or Parent.

31.     In the event that the Offices determine that the Defendant or Parent has breached this Agreement:  (a) all statements made by or on behalf of the Defendant, Parent, and their subsidiaries and affiliates to the Offices or to the Court, including the attached Statement of Facts, and any testimony given by the Defendant or Parent before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant, Parent, and their subsidiaries and affiliates; and (b) the Defendant, Parent, and their subsidiaries and affiliates shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant or Parent prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, Parent, and their subsidiaries and affiliates, will

28

be imputed to the Defendant, Parent, and their subsidiaries and affiliates for the purpose of determining whether the Defendant, Parent, and their subsidiaries and affiliates have violated any provision of this Agreement shall be in the sole discretion of the Offices.

32.     The Defendant and Parent acknowledge that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant or Parent breaches this Agreement and is subsequently prosecuted for any crime, or if the breach constitutes a violation of the Defendant's probation. The Defendant and Parent further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Public Statements by the Defendant or Parent

33.     The Defendant and Parent expressly agree that they shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant or Parent make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Attachment A. Any such contradictory statement shall, subject to cure rights of the Defendant and Parent described below, constitute a breach of this Agreement, and the Defendant and Parent thereafter shall be subject to prosecution as set forth in Paragraphs 29-32 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment A will be imputed to the Defendant and Parent for the purpose of determining whether they have breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Attachment A, the Offices shall so notify the Defendant and Parent, and the Defendant and Parent may avoid a breach

of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant and Parent shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment A provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment A. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant or Parent in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant or Parent.

34.     The Defendant and Parent agree that if they or any of their direct or indirect subsidiaries or affiliates over which the Defendant or Parent exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant and Parent shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant and Parent; and (b) whether the Offices have any objection to the release or statement.

## Complete Agreement

35.     This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR AUSTAL USA, LLC:**

Date: 7/16/2024          By: _____

Christopher Chadwick

30

Chair of Austal USA, LLC Board of

Managers

Date: July 16, 2024

By: _____

Ike Adams
Sidley Austin LLP

Edward O'Callaghan
WilmerHale LLP

Outside counsel for Austal USA, LLC

**FOR AUSTAL LIMITED:**

Date: 17 July 2024

By: _____

John Rothwell
Non-executive Director of Austal Limited

Date: July 16, 2024

By: _____

Ike Adams
Sidley Austin LLP

Edward O'Callaghan
WilmerHale LLP
Outside counsel for Austal Limited

**FOR THE DEPARTMENT OF JUSTICE:**

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

_____

Kyle C. Hankey
Assistant Chief

Laura Connelly
Robert Spencer Ryan
Trial Attorneys

31

**FOR THE U.S. ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF ALABAMA:**

SEAN P. COSTELLO
United States Attorney
United States Attorney's Office
Southern District of Alabama

Christopher Bodnar
Assistant United States Attorney

32

## ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of Alabama (the "Offices") and Austal USA, LLC ("Austal USA" or the "Defendant"), and the Offices and Defendant hereby agree and stipulate that the following information is true and accurate.  Austal USA admits, accepts, and acknowledges that it is responsible for the acts of its officers, managers, employees, and agents as set forth below.  Had this matter proceeded to trial, Austal USA acknowledges that the Offices would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information:

### The Defendants and Relevant Entities and Individuals

1.      Austal USA was a shipbuilder based in Mobile, Alabama, and a subsidiary of Austal Limited, an international shipbuilding company based in Australia.  One of the ship classes that Austal USA built was the U.S. Navy's Independence-class Littoral Combat Ship (LCS). Austal USA built the LCS ships under contracts with the U.S. Navy and designated the individual vessels with even numbers (LCS-6, -8, -10, etc.).

2.      Austal Limited was a publicly-traded company that listed its shares on the Australian Securities Exchange (ASX).   Austal Limited was and is subject to Defense Counterintelligence and Security Agency foreign ownership, control and influence mitigation requirements that limit its ability to influence or control the operations of Austal USA. Austal Limited sponsored American Depositary Receipts ("ADRs") for purchase in the over-the-counter ("OTC") market in the United States.  An ADR is a negotiable certificate issued by a U.S.

depository bank representing a specified number of shares of a foreign company stock.  Each American Depositary Receipt was equivalent to ten ordinary shares of Austal Limited traded on the ASX.  Austal Limited's shares and ADRs trading on the American OTC are securities within the meaning of Section 3(a)(10) of the Exchange Act, which defines a "security" to include, among other things, "any… stock."

3.      Craig D. Perciavalle was Austal USA's President.  Perciavalle was the senior-most corporate executive officer at Austal USA and had significant responsibility for Austal USA's shipbuilding and financial operations.

4.      Joseph A. Runkel was Austal USA's Director of Financial Analysis.  Among other duties, Runkel was responsible for preparing certain financial information that he provided to interested parties for the final preparation of Austal USA's accounting records, including to Austal USA's independent financial statement auditors.  Runkel also conducted separate analyses and reporting regarding Austal USA's financial performance on its shipbuilding contracts.  In 2013 through 2016, Runkel reported to Austal USA's Chief Financial Officer at the time, CC-1, who was responsible for overseeing Austal USA's accounting records.  CC-1 is now deceased.

5.      From in or around 2010 until in or around July 2015, William O. Adams was Austal USA's Program Director over the LCS program and was responsible for approving financial information about the LCS program that was sent to the Finance Department for use in the final preparation of Austal USA's accounting records.  Adams also provided information about Austal USA's financial performance on the LCS program to Austal USA's independent auditors.  From at least 2013 until 2015, Adams reported directly to Perciavalle.

6.      Austal USA relied on shipbuilding cost estimates called "estimates at completion" (EACs) to calculate the profitability of each vessel, including those in the LCS program, and to

prepare Austal USA's overall financial reporting.  EACs represented the estimated total cost to complete a project (for Austal USA, a vessel) at any given point in time.  The EACs were calculated by adding the actual costs to date for a vessel to the estimated remaining cost to complete the vessel (ETC).  Generally, the lower the EACs recorded by Austal USA, the higher the profit Austal USA reported in its financial statements, provided that Austal USA's revenue remained the same.  Similarly, when Austal USA raised the EACs it recorded, it generally resulted in lower profit, if the revenue it received from the contract remained the same.  To report accurate financial results, Austal USA needed to provide management's best estimate of the probable outcome for its EACs on the ships.

7.     The LCS program EACs included estimates of both the costs to purchase materials and subcontracts for ship construction (non-labor EACs) and the labor costs for building the ships (labor EACs).

8.     Austal USA compiled final EACs and information about the LCS program into a monthly Board Report and distributed it to Austal USA's Board of Managers, which included certain Austal Limited executives.  Similarly, Austal USA regularly prepared accounting records that it transmitted to Austal Limited.  Austal Limited used this information from Austal USA to report information about the performance of the LCS program and financial information to various parties, including shareholders, the investing public, and financial institutions.

9.     Austal Limited published and released to its shareholders, the investing public, and financial institutions various reports and announcements concerning its business operations, including the financial performance of Austal Limited, Austal USA, and the LCS program.  This included annual reports and semi-annual reports that contained financial statements that Austal Limited represented as a "true and fair view" of the financial position of Austal Limited.  In

addition to Austal Limited's published and released announcements, Austal Limited and Austal USA executives, including Perciavalle, presented financial and other information to shareholders, the investing public, and financial institutions through earnings calls and other presentations.

### Austal USA's Independent Financial Statement Auditors

10.     An independent financial statement auditor is a certified public accountant who examines the financial statements that a company's management has prepared.  Austal USA retained Accounting Firm 1 to perform an independent audit of Austal USA's financial statements for fiscal years 2014, 2015, and 2016, and to provide an opinion that Austal USA's financial statements were free from material misstatements, used appropriate accounting policies, included reasonable significant accounting estimates by management, and overall fairly presented, in all material respects, the financial position of Austal USA.  Austal Limited received Accounting Firm 1's opinion regarding Austal USA in connection with the preparation of financial statements and other information Austal Limited published, released, and presented to shareholders, the investing public, and financial institutions.  Accounting Firm 1 also conducted half-year reviews in 2014, 2015, and 2016, which were more limited in scope than the full-year audits.

11.     Accounting Firm 1 relied on Perciavalle, CC-1, Runkel, Adams, and other Austal USA employees to provide truthful and accurate information about Austal USA's financial condition and operations, including those involving the LCS program, in order for Accounting Firm 1 to provide an accurate and reliable audit opinion.  Accounting Firm 1 obtained this information from Perciavalle, CC-1, Runkel, Adams, and other Austal USA employees through phone calls, meetings, emails, and signed letters from management (referred to as "management representation letters") certifying to Accounting Firm 1 that certain facts were true.

**The Defense Contract Audit Agency**

12.     The Defense Contract Audit Agency (DCAA) is an agency of the United States government that employs federal auditors to perform audits for and on behalf of the U.S. Department of Defense.  Among other audits, DCAA conducts financial capability audits of federal government contractors like Austal USA in order to advise the Department of Defense and its military branches, like the U.S. Navy, on whether the audited contractor has the financial ability to perform as promised in its contracts with the government.

**The Securities Fraud Scheme**

13.     From at least 2013 through at least 2016, Austal USA, through Perciavalle, CC-1, Runkel, Adams, and others, agreed and schemed to make and cause others to make false and misleading statements about Austal USA's financial performance on the LCS program and Austal USA's overall financial condition to defraud Austal Limited's shareholders and the investing public.

14.      Specifically, beginning at least in or around 2013, Perciavalle, CC-1, Runkel, Adams, and others knew that Austal USA's LCS shipbuilding program was underperforming and over budget.  With this knowledge, they intentionally provided and caused others to provide false and fraudulent financial information and other information about the LCS program to certain members of Austal USA's Board of Managers, Austal Limited's Board of Directors, Accounting Firm 1, and accounting employees of Austal Limited, including for dissemination to Austal Limited's shareholders and the investing public.  To do so, Perciavalle, CC-1, Runkel, Adams, and others artificially reduced and suppressed EACs to levels that were unrealistic and materially different from management's best estimates, and provided materially false and misleading

information about Austal USA's progress on its LCS vessels to conceal problems with meeting financial metrics for the performance of the program.

15.    The purpose of the securities fraud scheme was for Austal USA to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program in order to (a) maintain and increase the share price of Austal Limited's stock, to the benefit of Austal Limited and Austal USA; and (b) unjustly enrich senior executives of Austal USA through the continued receipt of compensation, stock, and other benefits.

*Concealment of Negative Performance and Rising Costs on the LCS Program*

16.    In late 2012 and early 2013, the LCS Program Material Manager, who was responsible for calculating the LCS non-labor EACs, discovered millions of dollars in non-labor cost growth on each LCS vessel.  The LCS Program Material Manager reported this cost growth to CC-1, Runkel, Adams, and others.

17.    By in or around mid- to late 2013, Perciavalle, CC-1, Runkel, Adams, and others knew that millions of dollars in additional non-labor costs would likely occur on multiple LCS vessels.  Throughout the rest of 2013, Perciavalle, CC-1, Runkel, Adams, and others knew that the non-labor costs on the LCS vessels continued to rise despite efforts to control them.

18.    Instead of disclosing the true extent of the rising LCS non-labor costs, Austal USA, at the behest of Perciavalle, CC-1, Runkel, Adams, and others, improperly reported suppressed and fictitious non-labor EAC numbers.  Perciavalle, CC-1, Runkel, Adams, and others used what they called a "program challenge"—a figure in the accounting records disguised as a cost-savings goal—to reduce the EACs to levels that would conceal the rising costs for materials and subcontracts on the LCS program.  In reality, Austal USA used the "program challenge" as a plug

number and a fraudulent device to hide growing costs that should have been incorporated into Austal USA's financial statements. This use of false and misleading "program challenge" entries in Austal USA's financial records had the effect of offsetting growing costs and thus artificially lowering Austal USA's EACs, thereby causing Austal USA and, consequently, Austal Limited to falsely report inflated earnings from the LCS program and conceal negative information about Austal USA's performance on the LCS program.

19.     Throughout in or around 2014 and 2015, the "program challenge" offsets applied to non-labor EACs for multiple LCS vessels continued to grow in order to offset rising costs on those vessels. Perciavalle, CC-1 Runkel, Adams, and others continued to use program challenges to fraudulently suppress the EACs in order to conceal the true extent of the non-labor cost growth and negative performance issues on the LCS program from Austal Limited's shareholders, the investing public, Accounting Firm 1, and members of the Austal USA Board and Austal Limited Board.

20.     By at least in or around 2014, Perciavalle, CC-1, Runkel, Adams, and others also became aware of growing labor costs to complete LCS vessels. It became increasingly apparent that the ships would take more effort and time to build than originally budgeted, which caused labor costs to grow significantly. Perciavalle, CC-1, Runkel, Adams, and others knew that it would take significantly more labor hours than budgeted to build a number of LCS vessels, but they fraudulently suppressed the EACs for the labor costs on those vessels. Despite knowing about the growing labor costs, until around mid-2016, Perciavalle, CC-1, Runkel, and Adams fraudulently suppressed the labor EACs for LCS vessels to values that concealed the extent of the labor cost growth and negative performance issues from Austal Limited's shareholders, the investing public, Accounting Firm 1, and members of the Austal USA Board and Austal Limited Board.

### *False and Misleading Statements to Accounting Firm 1*

21.     One of the means used by Perciavalle, CC-1, Runkel, Adams, and others to conceal the negative performance issues and cost growth on the LCS program was to mislead and deceive Accounting Firm 1 during its audits and reviews of Austal USA's financial statements, which Perciavalle, CC-1, Runkel, Adams, and others knew were used to prepare Austal Limited's financial statements and other documents on which shareholders and the investing public relied.

22.     For example, in multiple years, Adams and Runkel met with Accounting Firm 1 to discuss the LCS program as part of the annual audit of Austal USA's financials.  In connection with two such meetings, in or around June 2014 and in or around July 2015, Adams, Runkel, and others prepared, and Adams signed, Contract Analysis Questionnaires.  The Questionnaires contained LCS EACs that Adams and Runkel knew were artificially suppressed and did not reflect management's best estimates.  Adams and Runkel knowingly and intentionally provided false and misleading answers to questions from Accounting Firm 1 in order to conceal the extent of Austal USA's poor performance on the LCS program and the rising costs to build the LCS vessels.

23.     In another example of how Austal USA, through its executive leadership, deceived Accounting Firm 1, Perciavalle, CC-1, and Austal USA's Controller signed management representation letters in connection with annual audits and half-yearly reviews conducted by Accounting Firm 1.  For example, on or about February 19, 2016, Perciavalle, CC-1, and Austal USA's Controller signed a management representation letter addressed to Accounting Firm 1 that falsely stated, "All contract related estimates represent management's best estimate as of December 31, 2015."  The letter also contained the following false representations, among others:

- "We have provided you with [a]ccess to all information, of which we are aware, that is relevant to the preparation and fair presentation of the interim financial reporting package such as records, documentation and other matters[.]"

- "We have no knowledge of any fraud or suspected fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.  In addition, we have no knowledge of any fraud or suspected fraud involving other employees where the fraud could have a material effect on the interim financial reporting package."

Perciavalle, CC-1, and Austal USA's Controller also signed a management representation letter addressed to Accounting Firm 1 on or about August 24, 2015, and Perciavalle and CC-1 signed a management representation letter addressed to Accounting Firm 1 on or about August 15, 2014.

24.     Perciavalle, CC-1, Runkel, and Adams knew these representations were false at the time Perciavalle and CC-1 signed the management representation letters and at the time Runkel and Adams submitted the Contract Analysis Questionnaires to Accounting Firm 1.

### Causing False and Misleading Information to be Released to Shareholders and the Investing Public

25.     By concealing negative information about Austal USA's performance and the extent of the cost growth on the LCS program from members of the Austal USA Board and Austal Limited Board and Accounting Firm 1, Austal USA, through the actions of Perciavalle, CC-1, Runkel, Adams, and others, knowingly and intentionally caused Austal Limited to communicate false and misleading information to Austal Limited's shareholders and to the investing public in Austal Limited's required annual and semi-annual financial reporting.  By doing so, Austal USA caused pecuniary harm to the investing public by fraudulently inflating the price of Austal Limited shares and ADRs by over $48 million.

26.     For example, on or about August 27, 2014, Perciavalle, CC-1, Runkel, Adams, and others caused Austal Limited to file false and misleading information in an ASX Appendix 4E for the year ending on June 30, 2014.  Among other things, Perciavalle, CC-1, Runkel, Adams, and others caused Austal Limited to falsely overstate its earnings by millions of dollars by using artificially suppressed EACs for certain LCS vessels in the Austal USA financial statements.

27.     Also, on or about August 26, 2015, Perciavalle, CC-1, Runkel, Adams, and others caused Austal Limited to file false and misleading information in an ASX Appendix 4E for the year ending on June 30, 2015.  Among other things, Perciavalle, CC-1, Runkel, Adams, and others caused Austal Limited to falsely overstate its earnings by millions of dollars by using artificially suppressed EACs for certain LCS vessels in the Austal USA financial statements.

28.     On or about December 10, 2015, Austal Limited released a "US Shipbuilding Progress Update" to investors, stating that "FY2016 earnings from Austal's US shipyard are expected to be lower than in FY2015, with US shipbuilding EBIT margin expected to be in the range of 4.5% to 6.5%."  The announcement attributed lowered earnings to the LCS program, namely that "Austal's ability to apply lessons learnt and productivity enhancements from LCS 6 to vessels in advanced construction, namely LCS 8 and LCS 10, has been more limited than anticipated."  This announcement revealed previously undisclosed information about performance issues on the LCS program, but, because Perciavalle, CC-1, Runkel, Adams, and others concealed their fraudulent scheme from certain members of the Austal USA and Austal Limited Boards, it did not reveal the true extent of performance issues and cost growth on the program.  As a result of this announcement, the share price of Austal Limited's stock was significantly negatively impacted.

29.     On or about July 4, 2016, Austal Limited reported that it expected to record a significant EBIT (Earnings Before Interest and Taxes) loss in fiscal year 2016, which the company primarily attributed to a "US$115 million . . . one off write back of work in progress . . . required to recognise an increase in the cost of construction" of the LCS ships.  Austal Limited reported that this change of estimate was determined following "an extensive review of the LCS program."  The change in estimate meant that "too much revenue and profit was attributed to work already

completed."  Again, as a result of this announcement, the share price of Austal Limited's stock was significantly negatively impacted.

30.     In the December 10, 2015 and July 4, 2016 announcements, Austal Limited did not attribute the adjustments to an effort to correct past misstatements of the LCS EACs.  Because Perciavalle, CC-1, Runkel, Adams, and others concealed their fraudulent scheme from certain members of the Austal USA and Austal Limited Boards, Austal Limited did not disclose the fact that Perciavalle, CC-1, Runkel, Adams, and others knew about the performance issues and cost growth well before the announcements but concealed that information so that it was not reported to Austal Limited's shareholders and the investing public.

### Banks 1 and 2 Received Financial Statements Containing False Information About Austal USA's Financial Condition

31.     While one primary purpose of the securities fraud scheme was to defraud shareholders and the investing public, it also affected financial institutions, including Bank 1 and Bank 2.  In or around October 2015, Austal Limited entered into a syndicated facility agreement (SFA) for approximately $105 million with Bank 1 and Bank 2.  Austal Limited entered into the SFA with Bank 1 and Bank 2 to finance construction at Austal USA's shipyard in Mobile, Alabama, among other purposes.

32.     As part of the agreement between Austal Limited and the banks, Austal Limited agreed to follow certain terms designed to limit the risk borne by the banks.  These terms were known as "financial covenants."  Prior to entering the SFA, Austal Limited was required to report certain financial figures to the banks so the banks could make reasonable determinations with regard to the level of credit risk and the fees to be charged in connection with the SFA.  After entering the SFA, Austal Limited was required to periodically report financial information to the banks to show it remained in compliance with the covenants.  The SFA included a "[n]o misleading

information" clause that provided, in part, that "[a]ny factual information provided by or on behalf of" Austal Limited "was true and accurate in all material respects and not misleading as at the date it was provided[.]"

33.     Prior to entering into the SFA, Bank 1 and Bank 2 were provided with Austal USA's and Austal Limited's financial statements for fiscal years 2014 and 2015.  In signing the SFA, an executive from Austal Limited agreed that all information provided as part of the agreement was accurate and truthful.

34.     Austal USA, through the actions of Perciavalle, CC-1, Runkel, Adams, and others, caused Austal Limited to provide financial statements to Bank 1 and Bank 2 for fiscal years 2014 and 2015 that falsely overstated Austal USA's and Austal Limited's earnings by millions of dollars by using artificially suppressed EACs for the LCS program.

### Austal USA's Obstruction of a Federal Audit

35.     In or around December 2014, at the request of the U.S. Navy, DCAA began conducting a financial capability audit of Austal USA to determine if the company had adequate financial resources to perform on its government contracts.  In order to complete an audit that the Navy could rely on to make decisions impacting its contracts with Austal USA, DCAA relied on Austal USA to provide accurate and truthful information during the audit.

36.     During 2015, Austal USA, through the actions of CC-1 and others, with the intent to deceive and defraud the United States, provided false and misleading information to DCAA in order to influence and obstruct DCAA's financial capability audit.  Specifically, intending to benefit Austal USA, CC-1 sought to deceive DCAA into believing that Austal USA's financial statements were prepared in accordance with applicable requirements, with the purpose of

concealing Austal USA's securities fraud scheme and inducing DCAA to provide a favorable opinion regarding Austal USA's financial condition.

37.     In or around May, June, and July 2015, CC-1 and others caused an Austal USA accounting employee to provide DCAA false and misleading financial information that was consistent with the false information that Austal USA provided to Austal Limited's accounting department for reporting to Austal Limited's shareholders.  In doing this, CC-1 and others intended to conceal the cost growth on the LCS program and deceive DCAA into believing that Austal USA's financial statements were prepared in accordance with applicable requirements.

38.     On or about July 23, 2015, CC-1 denied DCAA's request to meet with Accounting Firm 1 to discuss, among other things, the revenue recognition method used by Austal USA and Accounting Firm 1 to calculate Austal USA's earnings.  This revenue recognition method relied heavily upon EACs reported by management to accurately calculate revenue and profit.

39.     On or about November 5, 2015, knowing that Austal USA's audited financial statements for the year-end 2015 falsely inflated the company's earnings due to the securities fraud scheme, CC-1 wrote a letter to DCAA urging DCAA to consider those year-end 2015 financial statements prior to issuing DCAA's final financial capability audit report.  CC-1 did so with the intent to deceive DCAA into believing that Austal USA's year-end 2015 financial statements accurately portrayed the company's true financial condition, when they did not, in order to influence DCAA to issue an unqualified and clean financial capability audit report.

ATTACHMENT B

**<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>**

WHEREAS, Austal USA, LLC (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Alabama (together, the "Offices") regarding issues arising in relation to the Offices' investigation of Securities Fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and Obstruction of a Federal Audit, in violation of Title 18, United States Code, Section 1516; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a Plea Agreement with the Offices (the "Agreement"); and

WHEREAS, the Company's Vice President of Legal Affairs, together with outside counsel for the Company, have advised the Board of Managers of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Board of Managers has RESOLVED that:

1.  The Company (a) acknowledges the filing of the two-count Information charging the Company with one count of Securities Fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and one count of Obstruction of a Federal Audit, in violation of Title 18, United States Code, Section 1516; (b) waives indictment on such charges and enters into the Agreement with the Offices; and (c) agrees to accept a fine against the Company totaling $24,000,000, and to pay such penalty as required by the Agreement, which amounts will be offset by any payments made within twelve months following judgment by the Company or Austal Limited pursuant to a settlement with the U.S. Securities and Exchange Commission;

B-1

2.      The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its right to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue, and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Southern District of Alabama; and (c) a knowing waiver of any defenses based on the statute of limitations for any criminal prosecution by the Offices relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Offices prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3.      The Chair of the Board of Managers of the Company, Christopher Chadwick, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Managers at this meeting with such changes as the Chair of the Board of Managers of the Company, Christopher Chadwick, may approve;

4.      The Chair of the Board of Managers of the Company, Christopher Chadwick,  is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Chair of the Board of Managers of the Company, Christopher Chadwick, which actions would have been authorized by the foregoing resolutions

B-2

except that such actions were taken prior to the adoption of such resolutions, are hereby severally

ratified, confirmed, approved, and adopted as actions on behalf of the Company.


Date: 7/16/2024

By: _____

Austal USA, LLC

B-3

ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Austal Limited (the "Company") and its subsidiary, Austal USA, LLC ("Austal USA"), have been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Alabama (together, the "Offices") regarding issues arising in relation to the Offices' investigation of Securities Fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and Obstruction of a Federal Audit, in violation of Title 18, United States Code, Section 1516; and

WHEREAS, in order to resolve such discussions, it is proposed that Austal USA enter into a Plea Agreement with the Offices (the "Agreement"), with certain specific terms and obligations of the Agreement applicable to the Company; and

WHEREAS, the Company's General Counsel, together with outside counsel for the Company, have advised the Board of Directors of the Company of the terms of the Agreement;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company acknowledges (a) the filing of the two-count Information charging Austal USA with one count of Securities Fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and one count of Obstruction of a Federal Audit, in violation of Title 18, United States Code, Section 1516; (b) the waiver by Austal USA of its indictment on such charges and entry into the Agreement with the Offices; and (c) Austal USA's acceptance of a fine against Austal USA totaling $24,000,000, and payment of such penalty as required by the Agreement, which amounts will be offset by any payments made within twelve months following judgment by

Austal USA or the Company pursuant to a settlement with the U.S. Securities and Exchange Commission;

2.      The Company acknowledges the Company's and Austal USA's acceptance of the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of the Company's and Austal USA's right to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) the Company's and Austal USA's knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue, and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Southern District of Alabama; and (c) the Company's and Austal USA's knowing waiver of any defenses based on the statute of limitations for any criminal prosecution by the Offices relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Offices prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3.      The Company's non-executive director, John Rothwell ("Authorized Officer"), is hereby authorized, empowered and directed, on behalf of Austal Limited, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Authorized Officer may approve;

4.      The Authorized Officer is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions

of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Authorized Officer, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: ___17 July 2024___

By: _____

Austal Limited

**ACTION BY UNANIMOUS WRITTEN CONSENT OF
THE BOARD OF MANAGERS OF AUSTAL USA, LLC**

We, the undersigned, being all the members of the Board of Managers of Austal USA, LLC, an Alabama limited liability company (the "Company"), hereby consent to the following recitals and resolutions:

**WHEREAS**, pursuant to Resolutions of the Board of Managers of the "Company dated July 16, 2024 (the "July 16 Resolutions"), the Company entered into a Plea Agreement (the "Agreement") with United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of Alabama (together, the "Offices"), with certain specific terms and obligations of the Agreement applicable to the Company's parent company, Austal Limited, to resolve the Offices' investigation of Securities Fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and Obstruction of a Federal Audit, in violation of Title 18, United States Code, Section 1516;

**WHEREAS**, the July 16 Resolutions are incorporated by reference as if fully set forth herein;

**WHEREAS**, the United States District Court for the Southern District of Alabama (the "Court") has set Austal USA's Arraignment and Guilty Plea Hearings for 26 August 2024 at 1:30 PM Central Time;

**WHEREAS**, the Court has ordered a representative of the Company to be present for the Arraignment and Guilty Plea Hearings;

**WHEREAS**, consistent with the terms of the Agreement, Austal USA and the Offices intend to seek sentencing by the Court immediately following the Arraignment and Guilty Plea Hearings;

**NOW, THEREFORE, BE IT RESOLVED THAT:**

1.      Austal USA's Vice President of Legal Affairs, Adam Overstreet ("Authorized Representative"), is hereby authorized, empowered and directed to act as the Company's representative at the Arraignment, Guilty Plea, and Sentencing Hearings and otherwise to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the July 16 Resolutions and this resolution.

2.      All of the actions of the Authorized Representative, which actions would have been authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolution, are severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

DATED: 25 August 2024

Richard V. Spencer

DATED:

8/22/2024

Glenn P. Brady

DATED: 8/21/2024

Christopher M. Chadwick

DATED: _____21 August 2024

_____
Paddy Gregg

DATED: _08/20/2024_                          _Allison F. Stiller_
                                             Allison F. Stiller

## ACTION BY UNANIMOUS WRITTEN CONSENT OF
## THE BOARD OF DIRECTORS OF AUSTAL LIMITED

We, the undersigned, being all the members of the Board of Directors of Austal Limited (the "Company"), hereby consent to the following recitals and resolutions:

**WHEREAS**, the Company's subsidiary Austal USA, LLC ("Austal USA") entered into a Plea Agreement (the "Agreement") with United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of Alabama (together, the "Offices") to resolve the Offices' investigation of Securities Fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and Obstruction of a Federal Audit, in violation of Title 18, United States Code, Section 1516, and pursuant to Resolutions of the Board of Directors of the Company dated 17 July 2024 (the "17 July Resolutions"), the Company agreed to certain specific terms and obligations of the Agreement;

**WHEREAS**, the 17 July Resolutions are incorporated by reference as if fully set forth herein;

**WHEREAS**, the United States District Court for the Southern District of Alabama (the "Court") has set Austal USA's Arraignment and Guilty Plea Hearings for 26 August 2024 at 1:30 PM Central Time;

**WHEREAS**, consistent with the terms of the Agreement, Austal USA and the Offices intend to seek sentencing by the Court immediately following the Arraignment and Guilty Plea Hearings;

**NOW, THEREFORE, BE IT RESOLVED THAT:**

1.    Austal USA's Vice President of Legal Affairs, Adam Overstreet ("Authorized Representative"), is hereby authorized, empowered and directed to act as the Company's representative at the Arraignment, Guilty Plea, and Sentencing Hearings and otherwise to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions

of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the 17 July Resolutions and this resolution.

      2.    All of the actions of the Authorized Representative, which actions would have been authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolution, are severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

DATED: 21 August
2024

_____
Richard V. Spencer

_____
Paddy Gregg

_____

Austal Limited – Unanimous Consent & Resolution                 Page 2 of 3

John Rothwell

Sarah Adam-Gedge

Chris Indermaur

Lee Goddard

Kathryn Tooley

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with federal anti-fraud and government audit obstruction laws, Austal USA, LLC (the "Defendant") and its corporate parent, Austal Limited, agree to continue to conduct, in a manner consistent with all of their obligations under this Agreement, appropriate reviews of the Defendant's existing internal controls, policies, and procedures.

Where necessary and appropriate, the Defendant agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of federal anti-fraud and government audit obstruction laws (the "Subject Laws").  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Defendant's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Defendant will ensure that the members of its Board of Managers ("directors") and senior management provide strong, explicit, and visible support and commitment to compliance with the Defendant's corporate policies against violations of the Subject Laws, or violations of the Defendant's compliance policies and its Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

2.      The Defendant will ensure that mid-level management throughout its organization reinforce leadership's commitment to compliance policies and principles and encourage employees to abide by them.  The Defendant will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Company.

*Periodic Risk Assessment and Review*

4.      The Defendant will implement a risk management process to identify, analyze, and address the individual circumstances of the Company.

5.      On the basis of its periodic risk assessment, the Defendant shall take appropriate steps to design, implement, or modify each element of its compliance program to reduce the risk of violations of the Subject Laws, Defendant's compliance policies, and its Code of Conduct.

*Policies and Procedures*

6.      The Defendant will develop and promulgate a clearly articulated and visible corporate policy against violations of the Subject Laws, which shall be memorialized in a written compliance policy or policies.

7.      The Defendant will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Subject Laws, Defendant's compliance policies, and its Code of Conduct, and the Defendant will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violations of the Subject Laws by personnel at all levels of the Company.  These policies and procedures prohibiting violations of the Subject Laws shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Defendant in a foreign jurisdiction, including all agents and business partners.  The Defendant shall notify all employees

that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

8.      The Defendant will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the prevention and detection of violations of the Subject Laws.

9.      The Defendant shall review its compliance policies and procedures regarding the Subject Laws as necessary to address changing and emerging risks and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

10.      The Company will assign responsibility to one or more senior corporate executives of the Defendant for the implementation and oversight of the Defendant's compliance policies and procedures regarding the Subject Laws.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Defendant's Board of Managers, or, any appropriate committee of Austal Limited's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

11.      The Defendant will implement mechanisms designed to ensure that its Code of Conduct and compliance policies and procedures regarding the Subject Laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g.,

internal audit, sales, legal, compliance, finance), or positions that otherwise pose a fraud risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training. The Defendant will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

12.    The Defendant will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the compliance policies and procedures regarding the Subject Laws, including when they need advice on an urgent basis.

*Confidential Reporting Structure and Investigation of Misconduct*

13.    The Defendant will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Subject Laws or the Defendant's Code of Conduct or compliance policies and procedures regarding the Subject Laws

14.    The Defendant will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the Subject Laws or the Defendant's compliance policies and procedures regarding the Subject Laws.

*Compensation Structures and Consequence Management*

15.    The Defendant will implement clear mechanisms to incentivize behavior amongst all directors, officers, and employees, and, where necessary and appropriate, parties acting on behalf of the Company that comply with its corporate policy against violations of the Subject Laws

or violations of the Defendant's compliance policies and its Code of Conduct. These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system.

16.     The Defendant will institute appropriate disciplinary procedures to address, among other things, violations of the Subject Laws and the Defendant's Code of Conduct and compliance policies and procedures regarding the Subject Laws by the Defendant's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-fraud compliance program is effective.

*Third-Party Management*

17.     The Defendant will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     informing agents and business partners of the Defendant's commitment to preventing violations of the Subject Laws, and to preventing violations of the Defendant's Code of Conduct and compliance policies and procedures regarding Covered Misconduct; and

c.     seeking a reciprocal commitment from agents and business partners.

18.     The Defendant will engage in ongoing monitoring and risk management of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

19.   Where necessary and appropriate, the Defendant will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the Subject Laws, which may, depending upon the circumstances, include:  (a) representations and undertakings relating to compliance with the Subject Laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of laws prohibiting the Covered Misconduct, the Defendant's Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

20.     The Defendant will develop and implement policies and procedures for mergers and acquisitions requiring that the Defendant conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding the Subject Laws by legal, accounting, and compliance personnel.

21.     The Defendant will ensure that the Company's Code of Conduct and compliance policies and procedures regarding the Subject Laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

        a.     train the directors, officers, employees, agents, and business partners consistent with Paragraphs 11 and 12 above on the Subject Laws and the Defendant's compliance policies and procedures regarding the Subject Laws; and

b.        where warranted, conduct an audit of all newly acquired or merged businesses as quickly as practicable concerning their compliance with the Subject Laws.;

c.        where warranted, establish a plan to integrate the acquired businesses or entities into the Company's enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

22.     The Defendant will conduct periodic reviews and testing of all elements of its compliance program to evaluate and improve their effectiveness in preventing and detecting violations of the Subject Laws and the Company's Code of Conduct and compliance policies and procedures regarding the Subject Laws, taking into account relevant developments in the field and evolving international and industry standards.

23.     The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

24.     The Company will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures.  The Company will timely and appropriately remediate the root causes of misconduct.  The Company will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

**ATTACHMENT D**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Austal USA, LLC (the "Defendant") and Austal Limited ("Parent") (together, the "Companies"), on behalf of themselves and their subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section  and the United States Attorney's Office for the Southern District of Alabama (the "Offices"), are as described below:

1.      The Defendant will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 1 of the Plea Agreement (the "Agreement") is triggered.  Fees and costs associated with the Defendant's retention of the Monitor shall be expressly unallowable costs for Government contract accounting purposes.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Companies' compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, to specifically address and reduce the risk of any recurrence of the Defendant's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting and compliance policies and procedures of the Defendant as they relate to the Defendant's current and ongoing compliance with U.S. federal anti-fraud  and  government audit obstruction laws (the "Subject Laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the Defendant's Board of Managers' and Parent's Board of Directors and the

Companies' senior management's commitment to, and effective implementation of, Defendant's corporate compliance program described in Attachment C of the Agreement.

*Companies' Obligations*

3.      The Companies shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Defendant's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations.  To that end, the Companies shall: facilitate the Monitor's access to the Defendant's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Companies shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Defendant shall use its best efforts to provide the Monitor with access to the Companies' former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Companies to the Monitor concerning potential violations of the Subject Laws shall not relieve the Companies of any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Companies and the Monitor.  In the event that the Companies seek to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Companies that may be subject to a claim of attorney-client privilege or to the attorney work-

product doctrine, or where the Companies reasonably believe production would otherwise be inconsistent with applicable law, the Companies shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Companies shall promptly provide written notice to the Monitor and the Offices.  Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Defendant and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with the Companies' personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Companies' processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Companies, as well as the Companies' internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Defendant-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the industries in which the Defendant operates; (b) current and future business opportunities and transactions; (c) financial reporting obligations; (d) business interactions with government

officials, including the amount of government regulation and oversight of the Defendant in conducting its business affairs.

9.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Defendant's current policies and procedures governing compliance with the Subject Laws ; (b) on-site observation of selected systems and procedures of the Defendant at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former managers or directors, officers, employees, business partners, agents, and other persons at the Companies at mutually convenient times and places; and (d) analyses, studies, and testing of the Defendant's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below.  With respect to the first report, after consultation with the Companies and the Offices, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Companies and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan.  With respect to each follow-up report, after consultation with the Companies and the Offices, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Companies and the Offices shall provide comments within twenty (20) calendar days after receipt of the written work plan.  Any disputes between the Companies and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.   In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Companies.  It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.     The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Companies, the Monitor, and the Offices).  The Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Defendant's program for ensuring compliance with the Subject Laws.  The Monitor should consult with the Companies concerning his or her findings and recommendations on an ongoing basis and should consider the Companies' comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Companies prior to finalizing them.   The Monitor's reports need not recite or describe comprehensively the Defendant's history or compliance policies, procedures and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which

the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report

to the Boards of the Companies and contemporaneously transmit copies to

> Deputy Chief – MIMF Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005

After consultation with the Companies, the Monitor may extend the time period for issuance of

the first report for a brief period of time with prior written approval of the Offices.

13.      Within one hundred fifty (150) calendar days after receiving the Monitor's first

report, the Companies shall adopt and implement all recommendations in the report.  If the

Companies consider any recommendations unduly burdensome, inconsistent with applicable law

or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the

Monitor and the Offices of any such recommendations in writing within sixty (60) calendar days

of receiving the report.  The Companies need not adopt those recommendations within the one

hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor

and the Offices an alternative policy, procedure, or system designed to achieve the same objective

or purpose.  As to any recommendation on which the Companies and the Monitor do not agree,

such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days

after the Defendant or Companies serve the written notice.

14.      In the event the Companies and the Monitor are unable to agree on an acceptable

alternative proposal, the Companies shall promptly consult with the Offices.  The Offices may

consider the Monitor's recommendation and the Companies' reasons for not adopting the

recommendation in determining whether the Companies have fully complied with its obligations

under the Agreement.  Pending such determination, the Companies shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews*

16.     A follow-up review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Companies, the Monitor and the Offices).  The Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review.  After consultation with the Companies, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Offices.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's second report, the Companies shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Companies notify in writing the Monitor and the Offices concerning any recommendations that the Companies consider unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Companies need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or

system designed to achieve the same objective or purpose.  As to any recommendation on which the Companies and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Companies serve the written notice.

18.    In the event the Companies and the Monitor are unable to agree on an acceptable alternative proposal, the Companies shall promptly consult with the Offices.  The Offices may consider the Monitor's recommendation and the Companies' reasons for not adopting the recommendation in determining whether the Companies have fully complied with its obligations under the Agreement.  Pending such determination, the Companies shall not be required to implement any contested recommendation(s).  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

19.    The Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report. The Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.  Following the third review, the Monitor shall certify whether the Defendant's compliance program, including its policies, procedures, and internal controls, is reasonably designed and implemented to prevent and detect violations of the Subject Laws.  The final review and report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term.

*Monitor's Discovery of Potential or Actual Misconduct*

20.    (a)    Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that any member of the Board of

Managers, officer, employee, agent, third-party vendor, or consultant of the Defendant may have engaged in unlawful activity in violation of the Subject Laws ("Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Defendant's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed.  The Monitor also may report Potential Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when it requests the information.

(b)      In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Defendant. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Defendant, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Defendant; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)      If the Monitor believes that any Potential Misconduct has occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct to the Offices, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Defendant should occur as the Offices and the Monitor deem appropriate under the circumstances.

(d)      The Monitor shall address in his or her reports the appropriateness of the Defendant's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not.  Further, if the Defendant or any entity or person working directly

or indirectly for or on behalf of the Defendant withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Defendant's failure to disclose the necessary information in his or her reports.

(e)     The Defendant nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting between the Offices, the Monitor, and the Companies.

22.     At least annually, and more frequently if appropriate, representatives from the Companies and the Offices will meet to discuss the monitorship and any suggestions, comments, or improvements the Companies may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**<u>CERTIFICATION</u>**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention:  Chief of the Fraud Section


        United States Department of Justice
        United States Attorney's Office
        Southern District of Alabama
        Attention:  United States Attorney for the Southern
        District of Alabama

Re:     Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 12 of the plea agreement ("the Agreement")

filed on [DATE] in the United States District Court for the Southern District of Alabama, by and

between the United States of America and Austal USA, LLC (the "Company"), that undersigned

are aware of the Company's disclosure obligations under Paragraph 12 of the Agreement, and that

the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud

Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of

Alabama (collectively, the "Offices") any and all evidence or allegations of conduct required

pursuant to Paragraph 12 of the Agreement, which includes evidence or allegations of any violation

of federal anti-fraud laws committed by the Company's employees or agents ("Disclosable

Information").   This obligation to disclose information extends to any and all Disclosable

Information that has been identified through the Company's compliance and controls program,

whistleblower channel, internal audit reports, due diligence procedures, investigation process, or

other processes.  The undersigned further acknowledge and agree that the reporting requirements

contained in Paragraph 12 and the representations contained in this certification constitute a

significant and important component of the Agreement and of the Offices' determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are the President of the Company, the Chief Financial Officer of the Company, the Chief Executive Officer of Austal Limited, and the Chief Financial Officer of Austal Limited, and that each has been duly authorized by the Company and by Austal Limited to sign this Certification on behalf of the Company and Austal Limited.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Alabama.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Alabama.

Date: _____     Name (Printed): _____

Name (Signed): _____
President
Austal USA, LLC

Date: _____     Name (Printed): _____

Name (Signed): _____
Chief Financial Officer
Austal USA, LLC

Date: _____     Name (Printed): _____

Name (Signed): _____
Chief Executive Officer
Austal Limited


Date: _____      Name (Printed): _____


Name (Signed): _____
Chief Financial Officer
Austal Limited

ATTACHMENT F

**<u>COMPLIANCE CERTIFICATION</u>**

To:    United States Department of Justice
        Criminal Division, Fraud Section
        Attention:  Chief of the Fraud Section

        United States Department of Justice
        United States Attorney's Office
        Southern District of Alabama
        Attention:   United States  Attorney  for  the  Southern
        District of Alabama

Re:    Plea Agreement Certification

The undersigned certify, pursuant to Paragraph 9 of the Plea Agreement filed on [DATE], in the United States District Court for the Southern District of Alabama, by and between the United States of America and Austal USA, LLC (the "Company") (the "Agreement"), that the undersigned are aware of the Company's compliance obligations under Paragraphs 9 of the Agreement, and that, based on the undersigned's review and understanding of the Company's compliance program, the Company has implemented a compliance program that meets the requirements set forth in Attachment C to the Agreement.  The undersigned certifies that such compliance program is reasonably designed to detect and prevent violations of U.S. federal anti-fraud laws and government audit obstruction laws throughout the Company's operations.

The undersigned hereby certify that they are respectively the President of the Company, the Chief Compliance Officer ("CCO") of the Company, the Chief Executive Officer of Austal Limited, and the General Counsel of Austal Limited, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Alabama. This

Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Alabama.


Date: _____      Name (Printed): _____


Name (Signed): _____
President
Austal USA, LLC


Date: _____      Name (Printed): _____


Name (Signed): _____
Chief Compliance Officer
Austal USA, LLC


Date: _____      Name (Printed): _____


Name (Signed): _____
Chief Executive Officer
Austal Limited

Date: _____      Name (Printed): _____


Name (Signed): _____
General Counsel
Austal Limited